IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID PASKALIK, | ) | CASE NO. 1:10CV2869 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J.ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff David Paskalik ("Paskalik") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying his application for

Disability Insurance Benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. §

405(g) and/or 42 U.S.C. § 1383.  This matter has been referred to the undersigned Magistrate

Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, it is recommended that the Commissioner's decision be

AFFIRMED.

## I.  Procedural History

Paskalik filed an application for Social Security Disability benefits on May 10, 2007

alleging a disability onset date of August 31, 2002.  Tr. 113-122.  The state agency denied

Paskalik's claims initially on August 7, 2007 and upon reconsideration on October 19, 2007.  Tr.

85-87, 91-93.  Paskalik requested a hearing and, on October 8, 2009 a hearing was held before

Administrative Law Judge Traci Hixson (the "ALJ").  Tr. 1-38, 94, 98-99.

In a decision dated January 28, 2010, the ALJ determined that Paskalik was not disabled.

Tr. 46-63.  Paskalik requested review of this decision by the Appeals Council on February 17,

2010.  Tr. 44-45.    The Appeals Council denied Paskalik's request for review making the ALJ's

decision the final decision of the Commissioner.  Tr. 39-43.

## II. Evidence

### A.      Personal and Vocational Evidence

Paskalik was born on October 9, 1956.  Tr. 113, 120.  His past work experience includes

work as a truck driver/dock worker for Airborne Express, later bought by DHL.  Tr. 15, 31.   In

1998, Paskalik suffered a back injury at work.  Tr. 16, 29, 229; Pl's Brief at 2; Def's Brief at 1.

He later suffered another injury at work in 2002.  Tr. 16, 29; Pl's Brief at 2.  Paskalik's education

includes completion of one year of college.  Tr. 7.

### B.      Medical Evidence[1]

#### 1.         Medical evidence relating to Paskalik's physical impairment

##### a.        Treating Physician

Dr. Juan Hernandez, M.D. ("Hernandez") began treating Paskalik on February 17, 2004.

Tr. 230.[2] Hernandez reported "flatness of the lumbrosacral curve."  Tr. 230.  He also indicated

that there was "tenderness to palpitation of the paraspinal muscles of the lumbar sacral area."  Tr.

230.  The range of motion ("ROM") findings stated in those treatment notes referred to the

degrees of limitation, but did not include specific functional limitations or restrictions.  Tr. 230.

Hernandez continued to treat Paskalik through 2009 at which time, due to Hernandez's own

medical problems, he no longer provided treatment to Paskalik.  Tr. 4; Pl's Brief at 11, FN 2.

---

[1] Medical providers referenced by or relied upon by Plaintiff, Defendant and/or the ALJ have been summarized in this Report and Recommendation.

[2] At the request of the claimant's attorney, the ALJ agreed to leave the record open for twenty days following the hearing to allow the claimant additional time to obtain records from Dr. Juan Hernandez for a period of time after April, 2008.  Tr. 4-5.  The record reflects that, on January 13, 2010, Paskalik's attorney forwarded additional records from Dr. Hernandez, dated 6/5/07 to the ALJ.  Tr. 590-593.

### b.    Consultative Physician

Dr. Mehdi Saghafi, M.D. ("Saghafi") completed a consultative examination of Paskalik on July 20, 2007.  Tr. 360-365.  Based upon Saghafi's review of Paskalik's medical history and objective physical findings, Saghafi opined that Paskalik can sit, stand and walk for 6-8 hours per day, he does not need ambulatory aids, he is able to lift and carry 25 pounds of weight on a frequent basis and lift and carry up to 45 pounds of weight occasionally, he is able to push and pull objects not exceeding 60 pounds, he is able to manipulate objects, he is able to operate hand and foot controlled devices, he is able to drive a motor vehicle and travel, he is able to climb stairs, and his speech, memory, orientation and attention are within normal range.  Tr. 361.  Saghafi's diagnoses were depression, per history; hypertension; and degenerative disc disease L4-L5 and sacralization of L-5.  Tr. 361.

### c.    Agency Reviewing Physicians

On August 1, 2007, Diane Manos, M.D., ("Manos") a state agency reviewing physician, completed a physical RFC assessment.  Tr. 389-396.  She found that Paskalik can lift and/or carry 50 pounds occasionally and 25 pounds frequently; he can sit and/or walk for about 6 hours in an 8 hour work day; he can sit for about 6 hours in a normal 8 hour work day and his ability to push and/or pull (excluding the lift and/or carry limitations) is unlimited. Tr. 390.  Manos further indicated that the medical evidence shows Paskalik to have some reduced ROM in the dorsolumbar spine as well as some mildly reduced ROM in his bilateral knees.  Tr. 390.  Manos indicated that all other ROM testing was within normal limits.  Tr. 390.  Further, Manos noted that Paskalik has a normal gait and the ability to walk on heels and toes.  Tr. 390.  On October 16, 2007, Maria Congbalay, M.D. affirmed Manos' assessment of August 1, 2001.  Tr. 403.

### d.    Other Physicians

### *Kareti*

In 2004 and 2005, Dr. Mohan Kareti, M.D. performed epidural injections and radiofrequency neurolysis on Paskalik.  Tr. 334-349, 412-425.

### *Ghanma*

As part of his workers compensation claims, Paskalik underwent a number of independent medical examinations ("IMEs").  In February, 2005, August, 2005, and July, 2006, Dr. Manhal Ghanma, M.D. ("Ghanma") conducted IMEs.  Tr. 500-527.  In each of the IME reports, Ghanma opined that the objective findings contradicted Paskalik's subjective complaints.  Tr. 500-527.  For example, Ghanma noted that there was a discrepancy between the size of Paskalik's left and right thighs and, because Paskalik's right thigh was not smaller than his left thigh, Ghanma questioned Paskalik's complaints relative to his right sided radiculopathy.  Tr. 527.  He opined that, if the right sided pain complaints were reliable, the right thigh should be smaller than the left, not vice versa.  Tr. 526-527.  Further, he noted that Paskalik exhibited normal right sided reflexes with decreased reflexes on the left.  Tr. 527.  These objective findings were therefore inconsistent with Paskalik's subjective complaints.  Tr. 527.  Moreover, Ghanma indicated that Paskalik's subjective complaints were not consistent with the normal healing times for similar injuries, and he exhibited symptom magnification.  Tr. 511.  In 2006, Dr. Ghanma indicated that Paskalik had had sufficient time to recover from the 1998 injury and could return to the job he had at the time of this 1998 injury.  Tr. 505.

### *Sethi*

In 2006, Dr. Sushil Sethi, M.D. ("Sethi") conducted an IME of Paskalik.  Tr. 448-463. Sethi indicated that Paskalik had reached a treatment plateau many years prior.  Tr. 454.  Sethi determined that Paskalik's work related injuries had resolved a long time prior and he had nearly

normal ROM.  Tr. 455.  Sethi further opined that, while Paskalik may be intolerant of heavy

labor work, he is not precluded from performing work that does not include heavy lifting.  Tr.

455.  Sethi opined that Paskalik is capable of medium labor job activity, which would include

frequently lifting up to 20 pounds and occasionally 50 pounds, without extensive squatting and

bending.  Tr. 455-456.

### *Eppig*

In September 2006, Dr. Michael Eppig, M.D. ("Eppig"), an orthopedist, examined

Paskalik for his low back and leg pain.  Tr. 350-351.  Eppig noted that Paskalik's hips and knees

have full ROM, and that Paskalik could perform normal heel and toe walk, single leg stance, and

deep knee bends.  Tr. 351.  Eppig observed Paskalik walking with a smooth and natural gait.  Tr.

351.  Eppig reviewed EMG and nerve conduction studies from 2004 and noted that there was no

evidence of acute lumbar radiculopathy.  Tr. 351.  Eppig advised Paskalik that it was his opinion

that surgery was not likely to produce significant benefit to Paskalik.  Tr. 351.  Eppig opined that

Paskalik's lifestyle and inactivity was prolonging his recovery process.  Tr. 351.

### *Kovesdi*

In April, 2008, Dr. John M. Kovesdi, Jr. D.O. ("Kovesdi") conducted an IME for

determination of partial disability.  Tr. 555-558.  Kovesdi's physical examination revealed that

Paskalik walks with a normal gait, is able to heel-toe walk without weakness, has moderate

tenderness and guarding on palpation of the midline lower lumbar spine from approximately the

L3-S1, has a loss of normal lumbar lordotic curvature, has some limitations with ROM, and

some sensory loss in the lower extremity.  Tr. 557-558.

2.      **Medical evidence relating to Paskalik's mental impairment**

a.      **Consultative Physician**

On July 27, 2007, Dr. Sally A. Felker, Ph.D. ("Felker") completed a mental status examination of Paskalik.  Tr. 367-370.  Felker noted that Paskalik was cooperative and able to complete the examination without assistance.  Tr. 368.  She also noted that Paskalik's rate and volume of speech were satisfactory and his vocabulary was adequate.  Tr. 368.  Felker further indicated that Paskalik's responses were fairly well organized and he demonstrated good verbal skills.  Tr. 368.  Felker indicated that during the interview Paskalik's depression was obvious. Tr. 368.  Paskalik reported experiencing pain the majority of the time and being irritable and moody.  Tr. 368.  He further reported having difficulty falling asleep and acknowledged frequent crying spells due to chronic pain episodes.  Tr. 368.  Paskalik denied any history of suicidal ideation.  Tr. 368-369.  He further reported having little interest in social activities and having a diminished energy level.  Tr. 369.

Paskalik denied any history of hallucinations or psychiatric treatment.  Tr. 369.  Felker noted that Paskalik was oriented for person, place and time.  Tr. 369.  His ability to attend to tasks was restricted.   Tr. 369.  Felker indicated that Paskalik's insight and judgment were somewhat restricted.  Tr. 369.  However, Paskalik reported that he does not require assistance with the management of his affairs.  Tr. 369.  He manages his household affairs and finances. Tr. 369.  Paskalik reported information regarding his daily activities.[3]  Tr. 369.

---

[3] His daily routine consisted of the following: after waking in the morning, he washes, gets dressed and fixes a cup of tea; he sometimes eats breakfast; he takes his morning medication; he attempts light household chores; he reads the newspaper; he takes out the trash and washes dishes; he watches television most of the day; he prepares meals; he sometimes goes out for walks in the neighborhood; he attends physical therapy and keeps his medical appointments; and he runs errands for himself.  Tr. 369.

Felker diagnosed Paskalik with Major Depression, Recurrent Type and Pain Disorder Associated with both psychological factors and a general medical condition.  Tr. 369.  She opined that Paskalik shows moderate restriction in his ability to concentrate and attend to tasks due to the effects of his distractibility, anxiety and depressed mood.  Tr. 369.  She further opined that Paskalik's ability to understand and follow routine instructions and carry out one and two-step tasks is not impaired and he has adequate intellectual ability but has physical limitations due to lower back pain.  Tr. 370.  Per Felker, Paskalik's ability to relate to others and deal with the general public is moderately to markedly restricted based on his history of depression and chronic pain.  Tr. 370.  Further, according to Felker, Paskalik's ability to relate to work peers, supervisors and deal with stressors in the workplace is moderately impaired.  Tr. 370.  Felker assessed Paskalik's Global Assessment of Functioning (GAF) at 51.[4]  Tr. 370.

### b.    Agency Reviewing Physician

On August 1, 2007 Dr. Patricia Semmelman, Ph.D. ("Semmelman") completed a Mental Residual Functional Capacity Assessment ("Mental RFC") and a Psychiatric Review Technique ("PRT").  Tr. 371-388.  In the Mental RFC, Semmelman indicated some moderate limitations, but no marked limitations.  Tr. 371-373.[5]  Semmelman acknowledged that Felker reported some moderate-marked restrictions; however, Semmelman concluded that the evidence as a whole and Paskalik's daily living activities do not support marked limitations.  Tr. 373.  Semmelman

---

[4] GAF considers psychological, social and occupational  functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

[5] Those functions that Semmelman opined were moderately limited included:  the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to respond appropriately to changes in the work setting.  Tr. 371-372.

opined that Paskalik "can interact occasionally and superficially and receive instructions and ask questions appropriately in a more solitary and less public to nonpublic work setting."  Tr. 373. Further, she opined that Paskalik "can cope with ordinary and routine changes in a work setting that is not fast paced or of high demand."  Tr. 373.

In the PRT, Semmelman found Paskalik to suffer from Major Depression, Recurrent, but found that the impairment did not precisely satisfy the diagnostic criteria of Listing 12.04 (Affective Disorders).  Tr. 378.  She also found Paskalik to suffer from Pain Disorder.  Tr. 381. However, she likewise found that the impairment did not precisely satisfy the diagnostic criteria of Listing 12.07 (Somatoform Disorders).  Tr. 381.  Semmelman rated Paskalik's functional limitations under the "B" criteria of the Listings.  Tr. 385.[6]  Semmelman found no evidence to establish the presence of the "C" criteria of the Listings.  Tr. 386.

### c.      Other Physicians and Medical Providers

#### *Jaras*

Pamela Jaras, LISW ("Jaras") treated Paskalik from October 26, 2002 through October 4, 2003 with cognitive behavioral therapy.  Tr. 354-355.  On May 24, 2007, Jaras completed a Mental Status Questionnaire ("Questionnaire").  Tr. 354-358.  She noted that she had not seen Paskalik for four years.  Tr. 358.  Jaras indicated that Paskalik's ability to remember, understand, follow directions, maintain attention, sustain concentration, persist at tasks, and complete tasks in a timely fashion were all good.  Tr. 355.  Also, Jaras indicated that there were no deficiencies in social interaction or adaptation.  Tr. 355.   Paskalik's insight and judgment were noted by Jaras as fair to good.  Tr. 354.  However, she did indicate that Paskalik's mood and affect was

---

[6] Semmelman's ratings under the "B" criteria were as follows: (1) Restriction of Activities of Daily Living – mild limitation; (2) Difficulties in Maintaining Social Functioning – moderate limitation; (3) Difficulties in Maintaining Concentration, Persistence and Pace – moderate limitation; and (4) Episodes of Decompensation, Each of Extended Duration – no limitation.  Tr. 385.

"depressed, sad, tearful," and he was "hopeless at times." Tr. 354.   Jaras' diagnosis of Paskalik was Major Depressive Episode for which he was in treatment for one year. Tr. 355.  He was prescribed anti-depressants by his primary care physician. Tr. 355.  In the past, Jaras indicated that Paskalik had reacted to pressures in work settings and elsewhere with symptoms of depression. Tr. 355.

### *Chatterjee*

In March, 2004, Dr. Marian Chatterjee, Ph.D. ("Chatterjee"), a psychologist, examined Paskalik at the request of his attorney, apparently in connection with his workers compensation claim. Tr. 224.  Dr. Chatterjee completed a psychological examination.  Tr. 224-228. Chatterjee's mental status examination revealed that Paskalik's recent memory was fair and his remote memory was intact.  Tr. 227.  Abstraction was noted as satisfactory and judgment was fair.  Tr. 227.  Associations were noted as reality based with no symptoms of psychotic disorder. Tr. 227.  Chatterjee noted that Paskalik had experienced suicidal ideation without intent over the prior twelve months.  Tr. 227.  According to Chatterjee, the Beck Depression Inventory-II indicated depression in the severe range.  Tr. 227.

Chatterjee opined that Paskalik met the diagnostic criteria for Major Depression, Single Episode, Moderate to Severe.  Tr. 228.  Chatterjee indicated that the depression developed in 2002 when Paskalik's girlfriend abruptly broke up with him and that his work injury, inability to get treatment requested by his doctors, and his continued back pain and unemployment were factors contributing to the depression.  Tr. 228.  In 2004, at the time of the evaluation, Chatterjee indicated that injury related issues were the sole factors in maintaining Paskalik's then present depression.  Tr. 228.  Treatment recommendations included an eight to ten month trial of weekly counseling and psychiatric evaluation for medication.  Tr. 228.

The record also shows a second session with Dr. Chatterjee on April 12, 2005.  Tr. 223.
Dr. Chatterjee's notes from 2005 indicate that she provided encouragement and options to
Paskalik.  Tr. 223.  Dr. Chatterjee gave Paskalik information on Bridgeway but noted that
Paskalik might have to be psychotic to receive free services at Bridgeway.  Tr. 223.

### ***Kaplan***

In June, 2004, Dr. Robert Kaplan, Ph.D. ("Kaplan") evaluated Paskalik and completed a
Psychological Report in connection with his 1998 work related injury.  Tr. 547.  Kaplan opined
that Paskalik has a Major Depressive Disorder, Severe Episode, Moderate Severity directly and
proximately caused by a combination of: heavy alcohol use, perception that he was being
persecuted at work by his employer, a troubled relationship with his girlfriend that ended
abruptly, delays in approval for treatment, and workers compensation litigation.  Tr. 546.
Kaplan rated Paskalik as having a GAF of 60.  Tr. 544.  Kaplan indicated that it was his opinion
that Paskalik did not have a mental disorder that was directly and proximately caused by any
pain or disability relating to his work related injuries.  Tr. 546.  Kaplan further opined that
Paskalik has "greatly exaggerated the severity of any emotional distress and impairment related
to that distress given the results of psychological testing and discrepancies between his claimed
distress and level of daily activities."  Tr. 546.  Finally, Kaplan indicated that Paskalik suffers
from alcohol abuse and noted that abuse of alcohol is well known to both cause and aggravate
depression.  Tr. 547.

### C.  Testimonial Evidence

#### 1.  Paskalik's Testimony

The ALJ elicited testimony from Paskalik regarding his daily living activities.  Tr. 6-14.
She asked Paskalik about his past work at Airborne Express as well as his attempts to work since

leaving Airborne Express.  Tr. 14-17.  The ALJ asked Paskalik about his back injury, his level of

pain and his medical treatment for that injury.  Tr. 18-20, 22-23.  The ALJ also asked Paskalik

about his depression, including medications taken and medical treatment/counseling for his

depression.  Tr. 21-22.  The ALJ asked Paskalik a series of questions regarding limitations and

restrictions, including but not limited to his ability to sit, stand, bend, climb stairs, kneel, reach,

and interact with people.  Tr. 23-27.

### 2.  Vocational Expert's Testimony

Vocational Expert Bruce Holdereid ("Holdereid" or "VE") appeared and testified at the

administrative hearing.  Tr. 30-36.  The VE classified Paskalik's vocational history as primarily

that of a truck driver.  Tr. 31.  The VE indicated that, in some instances, as with Paskalik, truck

drivers are also required to load the truck.  Tr. 31.  In those instances where a truck driver is

required to load the truck, the exertional level may be heavy.  Tr. 31. Otherwise, a truck driver is

classified at a medium exertional level.  Tr. 31.  The VE testified that there would be no skills

transferrable to light or sedentary work with little vocational adjustment.  Tr. 31.

The ALJ proceeded to ask the VE if an individual such as Paskalik would be able to

perform his past work with the following assumptions being made about the individual's

abilities: able to lift and carry 20 pounds occasionally and 10 pounds frequently; limited in

ability to push and pull with lower extremities; able to occasionally climb stairs and ramps with

handrails, bend, balance and stoop; cannot kneel or crawl; able to reach in all directions; able to

hold, grasp, turn, pick, pinch and feel but not on a repetitive basis; would need to use an assistive

device (a cane); should have no exposure to vibration or hazardous conditions.  Tr. 31-32.  The

VE responded that, with those assumptions being made, such an individual would not be able to

perform his past work.  Tr. 32.

11

The ALJ next asked the VE about the individual's ability to perform other work.  Tr.  32.
The ALJ asked the VE to make the same assumptions as noted above with the following
additional limitations: sit/stand limitations of standing and walking for six hours and sitting for
six but with a sit-stand option every 30 minutes to allow for shifting of positions.  Tr. 32.   With
those parameters set, the VE testified that the following jobs would be available to the individual
in the regional and national economy: a photocopying machine operator, office helper, mail
clerk.[7]  Tr. 32-33.

The ALJ then added additional limitations, i.e., the person would need to perform simple
routine tasks with short simple instructions, would be making only simple work-related
decisions, and would have few workplace changes.  Tr. 33.  The VE responded that those
additional limitations did not change his opinion regarding the ability of the individual to
perform the stated jobs of a photocopying machine operator, office helper or mail clerk.  Tr. 33.
In response to the ALJ's inquiry regarding contact with the public, the VE indicated that the
stated jobs do not require contact with the public.  Tr. 33.  The ALJ then asked whether the stated
jobs would be available if the individual would have three to four unplanned absences each
month because of pain.  Tr. 33-34.   The VE stated that a limitation of that nature would preclude
an individual from performing the stated jobs, as well as any other jobs in the local, state or
national economy.  Tr. 33-34

Paskalik's attorney cross-examined the VE, asking whether the need to take Vicodin, if it
made the individual sleepy and required him to take four to five unscheduled fifteen minutes
breaks per day, would impact employability.  Tr. 34-35.  The VE indicated that, yes, such a
limitation would preclude employment for that individual.  Tr. 35.

---

[7] The VE also testified to the approximate numbers of each of the jobs in both the U.S. and Ohio.  Tr. 31-32.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her January 28, 2010, decision, the ALJ found that Paskalik last met the insured status requirement through December 31, 2008.  Tr. 51.  The ALJ also found that Paskalik did not engage in substantial gainful activity during the period from his alleged onset date of August 31, 2002 through his date last insured of December 31, 2008. Tr. 51.  The ALJ found that Paskalik has the following severe impairment:  degenerative disc disease of the lumbar spine. Tr. 51.  The ALJ determined that Paskalik did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments.  Tr. 54.

The ALJ determined that Paskalik has the following residual functional capacity ("RFC"): ability to perform light work, meaning he can lift and carry 20 pounds occasionally and 10 pounds frequently; limited ability to push/pull with lower extremities; ability to sit, stand and walk for six hours in an eight-hour work day, with the option to sit or stand every 30 minutes as defined in 20 C.F.R. §404.1567(b) except he can occasionally climb stairs and ramps with handrails, bend, balance and stoop; cannot kneel or crawl; can reach in all directions, hold, grasp, turn, pick, pinch and feel on a non-repetitive basis; needs to use a cane; and cannot be exposed to vibration or hazardous conditions.  Tr. 54.

14

The ALJ determined that, through the date last insured, Paskalik was unable to perform past relevant work.  Tr. 57.  The ALJ found that Paskalik was 52 years old on the date last insured, which is defined as a younger individual age 18-49[8], has at least a high school education and is able to communicate in English.  Tr. 57.  The ALJ found, based on his finding as to Paskalik's RFC and the VE's opinion testimony that Paskalik is capable of performing jobs that exist in significant numbers in the national economy, such as photocopy machine operator, office helper and mail clerk.  Tr. 57-58.  Accordingly, based on the foregoing findings, the ALJ determined that Paskalik was not under a disability from August 31, 2002, the alleged onset date, through December 31, 2008, the date last insured.  Tr. 58.

## V. Parties' Arguments

Paskalik asserts that there are three main issues for review.  Pl's Brief at 2.  First, Paskalik argues that the ALJ did not give appropriate weight to the evidence of the treating physicians, whom Paskalik identifies as Dr. Juan Hernandez (physical impairments) and Dr. Marian Chatterjee (mental impairments).  Pl's Brief at 2, 7-15.  Second, Paskalik argues that the ALJ erred in not having a medical expert at the hearing and improperly substituted her lay opinion for medical evidence.  Pl's Brief at 2, 15-18.  Third, Paskalik argues that the ALJ erred in not finding his depression to be a severe impairment at Step Two.  Pl's Brief at 2, 13-15.

In response, the Commissioner argues that Dr. Hernandez did not in fact provide a medical source opinion that required weight be given and that the ALJ's assessment of Paskalik's physical impairment is supported by substantial evidence.  Def's Brief at 9-11.  Regarding Paskalik's depression claim, the Commissioner argues that Dr. Chatterjee was not a treating physician and, in any event, Dr. Chatterjee also did not provide a medical source opinion

---

[8] While this finding has not been challenged, the undersigned notes that Paskalik's age on the date last insured does not fall within the range noted by the ALJ.

to be weighed. Def's Brief at 12-13. The Commissioner next argues that the ALJ did not err by failing to call a medical expert at the hearing and did not improperly assume the role of medical expert. Def's Brief at 15-17. Finally, the Commissioner argues that the ALJ's assessment of Paskalik's depression is supported by substantial evidence, and that it is legally irrelevant whether the ALJ should have found Paskalik's depression to be severe at Step Two because the ALJ did find one severe impairment (degenerative disc disease of the lumbar spine), and did consider Paskalik's depression at Steps Three through Five,. Def's Brief at 11-15.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence, or indeed, a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Paskalik v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.      The ALJ properly applied the treating physician rule.**

The Social Security Administration's Regulations provide rules regarding how to weigh "medical opinions." 20 C.F.R. §§ 404.1527(d), 416.927(d).  As noted in the Regulations, "medical opinions" are statements from acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairments, including symptoms, diagnosis and prognosis, what a claimant can still do despite his or her impairments, and a claimant's physical or mental restrictions.  20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

When applying the Regulations relating to how the Commissioner shall weigh medical opinions, the Sixth Circuit has stated that "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2).    If a treating source's opinion is not provided controlling weight, certain factors are to be applied by the ALJ to determine what weight should be given to the treating source's opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).  The factors to be considered are: (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors which tend to support or contradict the opinion.  *Bowen*, 478 F.3d at 747; 20 C.F.R. §§ 404.1527(d), 416.927(d).

A treating source is an acceptable medical source who provides, or has provided, a claimant with medical treatment or evaluation and who has had an ongoing treatment relationship with the claimant.  20 C.F.R. § 404.1502.  The Commissioner will generally

consider there to be an "ongoing treatment relationship" when the medical evidence establishes that a claimant is or has been seen with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for a claimant's medical condition.  *Id.*  If a physician has treated a claimant only a few times or after long intervals, the Commissioner may consider that physician to be a treating source if the nature and frequency of the treatment or evaluation is typical for the claimant's condition.  *Id.*  If the relationship with the acceptable medical source is not based on the claimant's medical need for treatment or evaluation but, rather, solely on the need to obtain a report in support of a disability claim, that medical source will not be considered to be a treating source.  *Id.*  In those instances where a physician is not a treating source, *Wilson* has been found to be inapplicable.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006), *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 490 (6th Cir. 2005).  Further, where a physician has been deemed to not be a treating source, analysis under *Wilson* is not required.  *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 837, 876 (6th Cir. 2007).

### Dr. Hernandez

Paskalik argues that the ALJ violated the treating physician rule in regard to her consideration of Dr. Hernandez' reports.  Pl's Brief at 7-13.  The Commissioner responds that the ALJ did not err in applying the treating physician rule because as indicated by the ALJ, Dr. Hernandez' reports do not contain any specific functional limitations.[9] (Tr. 56) Therefore, said reports do not constitute "medical opinions" under 20 C.F.R. § 404.1527, and are not entitled to weighed.  Def's Brief at 9.

---

[9] The ALJ also discusses the fact that Paskalik's treatment was conservative and that BWC examinations did not reveal findings suggestive of a disability.  Tr. 56.

Apparently recognizing that Dr. Hernandez did not in fact render an opinion as to any specific functional limitations, Paskalik first argues that Dr. Hernandez' treatment notes contain objective findings from which the ALJ should have inferred specific limitations. Pl's Brief at 11 and n.3.  However, Paskalik provides no authority for this proposition.  He then argues that Dr. Hernandez, in his treatment notes, opined, in direct contradiction of the ALJ's RFC finding, that he is unable to stand or walk for six hours in an eight hour workday, is unable to occasionally climb, bend, balance or stoop, and is unable reach in all directions.   Paskalik believes that this would support an RFC of sedentary rather than light level work and that if the ALJ had found that Paskalik was limited to sedentary work Paskalik would have gridded out under Rule 201.14 of the medical vocational guidelines.[10]  Pl's Brief at 12.  However, Paskalik fails to direct this Court to any treatment notes or any portion of the record in which Dr. Hernandez rendered such an opinion.  Under the Regulations, the claimant must bring to the Commissioner's attention everything that shows that he or she is disabled. 20 C.F.R. § 404.1512.  In other words, a claimant must provide medical and other evidence that can be used by the Commissioner to reach conclusions about medical impairments and their effect on the claimant's ability to work. 20 C.F.R. §§ 404.1512; 416.912.  Paskalik simply has not met this burden.

Based on the ongoing treatment relationship between Dr. Hernandez and Paskalik, Dr. Hernandez would qualify as a "treating physician." However, his lack of medical opinion regarding what Paskalik can still do despite his impairments or as to Paskalik's physical or mental restrictions removes Dr. Hernandez' reports from the "treating physician rule."

Even assuming that the "treating physician rule" were to apply to Dr. Hernandez' reports, i.e., if Dr. Hernandez' reports are construed to be "medical opinions" under 20 C.F.R. §§

---

[10] Medical –Vocational Guidelines (also known as the "grid") are found in Title 20 of the Code of Federal Regulations Part 404, Subpart P, Appendix 2.

404.1527(a)(2), 416.927(a)(2), a review of the ALJ's decision demonstrates that the ALJ did in fact consider Dr. Hernandez' reports but chose to not give those reports controlling weight for "good reasons."  As noted above, the ALJ determined that Dr. Hernandez' reports lacked specific functional limitations.  Tr. 56.  Further, the ALJ highlighted the fact that Dr. Hernandez' reports were not fully consistent with the record as a whole.  Tr. 56.  Specifically, the ALJ noted that Paskalik's treatment had been conservative and routine, and examinations performed by BWC medical examiners did not reveal findings suggestive of disability.  Tr. 56.  One of those BWC medical examiners, Dr. Sethi, opined, that while Paskalik may be intolerant of heavy labor work, he is not precluded from performing work that does not include heavy lifting.  Tr. 455.  Another BWC medical examiner, Dr. Ghanma, indicated that Paskalik's subjective complaints were not consistent with the normal healing times for similar injuries (Tr. 511), and he opined that Paskalik had had sufficient time to recover from the 1998 injury and could return to the job he had at the time of this 1998 injury.  Tr. 505.

Because Dr. Hernandez' reports do not contain a medical opinion as to functional limitations or restrictions, the ALJ did not violate the treating physician rule.  Alternatively, even if Dr. Hernandez' reports are deemed to contain medical opinions as to functional limitations or restrictions, the ALJ did provide an analysis and "good reasons" for not providing controlling weight to those reports.

### *Dr. Chatterjee*

Dr. Chatterjee was a consulting physician who saw Paskalik on two occasions based on a referral from Paskalik's attorney.  Tr. 220-228.   Paskalik argues that Dr. Chatterjee was his treating physician for his mental impairments and the ALJ "violated the treating physician rule in assessing Mr. Paskalik's mental limitations."  Pl's Brief at 13.  The ALJ provided a thorough

review of Dr. Chatterjee's report.  Tr. 52.  The Commissioner argues, and the undersigned

agrees, that Dr. Chatterjee was not a treating source and therefore the opinion is not entitled to

special deference.[11]  Def's Brief at 12.

Pursuant to the referral from Paskalik's attorney, in March, 2004, Dr. Chatterjee

evaluated Paskalik to determine whether he had developed a psychological disorder as a result of

his work injury.  Tr. 224.  The record also contains progress notes from a second session with Dr.

Chatterjee in April, 2005.[12]  Tr. 223.  The nature and frequency of Dr. Chatterjee's treatment or

evaluation of Paskalik are not indicative of an ongoing treatment relationship. 20 C.F.R. §

404.1502.

Contrary to Paskalik's argument, the ALJ did not violate the treating physician rule

because Paskalik's' relationship with Dr. Chatterjee does not rise to the level of an ongoing

treatment relationship, *See Smith*, 482 F.3d at 876; *Daniels*, 152 F. App'x at 490-491.  As noted

in the March, 2004 report of Dr. Chatterjee, the evaluation was conducted at the behest of

Paskalik's attorney.  Tr. 224.   This referral appears to have been made in support of Paskalik's

workers compensation claim, rather than being based on a need for treatment.  In the April, 2005

progress notes, Dr. Chatterjee indicated that encouragement and some information and options

were provided to Paskalik.  Tr. 223.  These two evaluations/sessions with Dr. Chatterjee cannot

be said to rise to the level of an ongoing treatment relationship deserving of treating source

deference.  *See Daniels*, 152 F. App'x at 490-491 (finding that the doctor did not qualify as a

---

[11] Defendant also argues that, like Dr. Hernandez, Dr. Chatterjee did not provide an opinion as to any functional limitations.  Def's Brief at 12-13.  Dr. Chatterjee's opinion of March 2004 does not include any functional limitations, nor does Dr. Chatterjee's April 2005 progress notes.  Tr. 223, 228.  Accordingly, the above analysis relating to Dr. Hernandez' report would be applicable to and supportive of Defendant's second argument, i.e., Dr. Chatterjee did not provide any functional limitations and therefore the report is not a medical opinion entitled to controlling weight.  Def's Brief at 13.

[12] Neither Plaintiff nor Defendant reference this April 2005 session.  It is not entirely clear from the record how or why Paskalik was referred for the session with Dr. Chatterjee in 2005.  Nonetheless, to allow for a complete analysis, the April 2005 session has been considered herein.

treating physician under the Regulations where the claimant had only two visits with the doctor within the span of a few days for back pain).  By comparison, when Paskalik was being treated by Pam Jaras, LISW, he had about 20 + sessions with her.  Tr. 226.

For the foregoing reasons, Paskalik's request to reverse and/or remand this matter based on a failure to give appropriate weight to evidence of treating physicians is without merit.

**B.**     **The ALJ was not required to have a medical expert at the hearing and the ALJ's review and assessment were proper and consistent with an ALJ's duty to determine issues reserved to the Commissioner.**

An ALJ is not required to call a medical expert.  *Davis v. Chater*, 1996 U.S. App. LEXIS 33614, *6 (6th Cir. 1996) (citing 20 C.F.R §§ 404.1527(f)(2), 416.927(f)(2)).  Where an ALJ has not abused his or her discretion, failure to call a medical expert does not preclude a court from finding substantial evidence to support an ALJ's decision.  *Id.*  Further, where the record contains sufficient evidence for an ALJ to decide a disability claim absent expert medical testimony, a failure to solicit expert medical testimony will not serve as a basis to reverse an ALJ's decision.  *See Williams v. Callahan*, 1998 WL 344073, *4 n. 3 (6th Cir. 1998) (finding that because the record contained the claimant's extensive medical history, the ALJ did not err in not soliciting expert medical testimony).

The Commissioner is correct in his argument that "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009).  The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician. *See* 20 C.F.R. §§ 404.1546(c), 416.946(c); 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2).

The ALJ's decision not to call a medical expert to testify at the hearing regarding Paskalik's physical and/or mental impairments was not error.  In this case, the ALJ had before her an extensive medical and non-medical record and her decision reflects the fact that full consideration was given to that record, including the various medical opinions.  For example, when establishing Paskalik's RFC, the ALJ discussed the opinions and reports of Dr. Saghafi, Dr. Hernandez, various Bureau of Worker's Compensation examinations, and State Agency Reviewing Physician reports.  Tr. 56.  When evaluating Paskalik's depression, the ALJ discussed and considered the opinions and reports of Dr. Chatterjee, Pam Jaras, LISW, Dr. Felker and Dr. Kaplan.  Additionally, when evaluating both the physical and mental impairments, the ALJ considered Paskalik's own testimony and his daily living activities, the testimony of the vocational expert and the overall medical history.  Tr. 51-58.

Here, the record contained sufficient evidence upon which the ALJ could and did evaluate Paskalik's disability claim.  Accordingly, Paskalik's request to reverse and/or remand this matter based on the ALJ's failure to call a medical expert to testify is without merit.

**C.      The ALJ did not err by not finding Paskalik's depression to be a severe impairment.**

The ALJ's determination at Step Two that Paskalik's depression is not a severe impairment was not error.

First, the ALJ did determine that Paskalik had one severe impairment, specifically, degenerative disc disease of the lumbar spine.  Tr. 51.  Having found that Paskalik had a severe impairment, the fact that Paskalik's depression was not found to be severe is legally irrelevant. *Anthony v. Astrue*, 266 Fed. Appx. 451, at 457 (6th Cir. 2008).  An ALJ is required to consider both severe and non-severe impairments in determining a claimant's RFC.  20 C.F.R. §§ 404.1545(e); 416.945(e).  Here, the ALJ did consider Paskalik's depression in determining his

RFC.  Specifically, the ALJ referred to Dr. Kaplan's assessments when explaining her RFC determination.  Tr. 56.  The ALJ also discussed Paskalik's own statements about how his depression impacts his ability to function.  Tr. 55.  Additionally, the ALJ evaluated the medical evidence in light of Paskalik's daily living activities.  Tr. 56.  A review of the ALJ's decision clearly demonstrates that although the ALJ did not determine Paskalik's depression to be severe, the ALJ did in fact consider Paskalik's depression when determining his RFC.

Second, a review of the ALJ's decision reveals that there is substantial evidence to support the ALJ's finding at Step Two.  The ALJ's decision is supported by Jaras' report.  Specifically, Jaras indicated that Paskalik's ability to remember, understand, follow directions, maintain attention, sustain concentration, persist at tasks, and complete tasks in a timely fashion were all good.  Tr. 355.  Also, Jaras indicated that there were no deficiencies in social interaction or adaptation.  Tr. 355.  Further, the ALJ's decision is supported by Dr. Kaplan's opinion.  Although Dr. Kaplan opined that Paskalik has a Major Depressive Disorder, Severe Episode, Moderate Severity, he also opined that Paskalik has "greatly exaggerated the severity of any emotional distress and impairment related to that distress given the results of psychological testing and discrepancies between his claimed distress and level of daily activities."  Tr. 546.  Further, the ALJ noted that Paskalik has not required any hospitalization for mental health problems.  Tr. 56.

Based on the foregoing, Paskalik's request to reverse and/or remand this matter based on the ALJ's failure to find Paskalik's depression to be a severe impairment is without merit.

### V.  Conclusion and Recommendation

For the foregoing reasons, it is recommended that the Commissioner's decision be

AFFIRMED.

Dated: December 16, 2011

Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir.
1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).